(Slip Opinion)

# Extending Regulatory Review Under Executive Order 12866 to Independent Regulatory Agencies

The President may direct independent regulatory agencies to comply with the centralized regulatory review process prescribed by Executive Order 12866.

October 8, 2019

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether the President may direct independent regulatory agencies to comply with the centralized regulatory review process of Executive Order 12866 of September 30, 1993, 3 C.F.R. 638 (1994) ("EO 12866"). EO 12866 requires all agencies to submit an annual regulatory plan and agenda to the Office of Information and Regulatory Affairs ("OIRA") in the Office of Management and Budget ("OMB"). But it exempts "independent regulatory agencies," as defined in 44 U.S.C. § 3502, from the rest of the order, which requires agencies to submit significant regulatory actions to OIRA for review. OMB has proposed that the President eliminate that exemption and require independent regulatory agencies to comply with all of EO 12866.[1]

Article II of the Constitution vests "[t]he executive Power" in the President, who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. By vesting the executive power in the President alone, the Constitution ensures that "a President chosen by the entire Nation oversee[s] the execution of the laws." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). The President can hardly ensure that the laws are faithfully executed "if he cannot oversee the faithfulness of the officers who execute them." *Id.* at 484. The President's constitutional authority therefore extends to the supervision of all agencies that execute federal law, including so-called "independent" agencies.

Although the Supreme Court has held that Congress may insulate independent agencies to some degree from presidential supervision, the pro-

---

[1] In preparing this opinion, we have solicited and considered the views of the Office of Management and Budget. *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Neomi Rao, Administrator, OIRA, and Mark Paoletta, General Counsel, OMB (Mar. 7, 2018) ("OMB Letter").

posed executive action would not test any statutory limits. Congress has often provided that the heads of those agencies are removable only for particular causes, such as "inefficiency, neglect of duty, or malfeasance in office." *E.g.*, 15 U.S.C. § 41. But statutory restrictions on removal, standing alone, do not bar those agencies from complying with EO 12866; indeed, the terms of such good-cause restrictions presuppose that the President may supervise an agency head to ensure compliance with the duties of office and with principles of good governance. Other structural features associated with independent agencies, such as multi-member governance, independent litigating authority, or open-meeting requirements, likewise do not preclude those agencies from complying with EO 12866. We therefore conclude that the President may direct independent agencies to comply with EO 12866.

## I.

Every President since Nixon has required systematic review of some rulemakings to ensure that federal regulations "achieve legislative goals effectively and efficiently" and do not "impose unnecessary burdens." Exec. Order No. 12044, 3 C.F.R. 152 (1979); *see* Curtis W. Copeland, Cong. Research Serv., RL32397, *Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs* 5–6 (June 9, 2009) ("*Role of OIRA*") (describing Nixon, Ford, and Carter Administration programs); Harold Bruff, *Presidential Management of Agency Rulemaking*, 57 Geo. Wash. L. Rev. 533, 546–49 (1989) (same). In February 1981, President Reagan took what is widely viewed as the decisive step in establishing a "centralized mechanism for review of agency rulemakings," Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2277 (2001), by issuing Executive Order 12291, 3 C.F.R. 127 (1982) ("EO 12291"). EO 12291 required covered agencies to follow general policies in issuing new regulations, "to the extent permitted by law," including that "[r]egulatory action shall not be undertaken unless the potential benefits to society . . . outweigh the potential costs." *Id.* § 2(b). The order further required agencies to submit to OMB an analysis of the regulatory impact of any "major" rule, including its potential costs and benefits. *Id.* § 3(a)–(c). In 1985, President Reagan also ordered agencies to participate in an annual regulatory planning process. Exec. Order No. 12498, 3 C.F.R. 323 (1986).

In September 1993, President Clinton issued EO 12866 "to reform and make more efficient the regulatory process" and "to enhance planning and coordination with respect to both new and existing regulations." EO 12866, pmbl. Like its predecessor, EO 12866 directs covered agencies to follow certain general principles, including cost-benefit principles, when engaging in regulatory action, "unless a statute requires another regulatory approach." *Id*. § 1(a); *see id*. § 1(b)(6) (agencies should "adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs"). Section 4 directs agencies to participate, "to the extent permitted by law," in an annual regulatory planning process. Each agency, including "independent regulatory agencies," must submit to OIRA "an agenda of all regulations under development or review" and an annual plan "of the most important significant regulatory actions that the agency reasonably expects to issue in proposed or final form." *Id*. § 4(b), (c). OIRA circulates each agency's plan to other affected agencies; if OIRA "believes that a planned regulatory action of an agency may be inconsistent with the President's priorities or the principles set forth in" EO 12866, it must notify the agency and the President's regulatory advisers. *Id*. § 4(c)(3), (5).

Section 6 of EO 12866 requires each agency, other than "independent regulatory agencies," to submit to OIRA, before publication, a draft of any proposed "significant regulatory action," together with an "assessment of the potential costs and benefits" of the proposed action and its legal basis. *Id*. § 6(a)(3)(B)(ii).[2] For any proposed regulatory action that is expected to be "economically significant," the agency must submit a more detailed analysis of the potential costs and benefits and of reasonably feasible potential alternatives. *Id*. § 6(a)(3)(C). Those requirements do not apply if an agency is "obligated by law to act more quickly," although an agency must schedule its rulemakings to permit OIRA review "to the extent practicable." *Id*. § 6(a)(3)(D). OIRA must complete its review within specified deadlines, *id*. § 6(b)(2), and an agency may not publish a

---

[2] The order defines a "regulatory action" as "any substantive action by an agency . . . that promulgates or is expected to lead to the promulgation of a final rule or regulation." EO 12866, § 3(e). A "rule" or "regulation," in turn, is defined as any "agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency," subject to certain exceptions. *Id*. § 3(d).

proposed or final rule pending OIRA review, "[e]xcept to the extent required by law," *id*. § 8. During the review process, OIRA may circulate the regulatory proposals to interested agencies and components of the Executive Office of the President, such as the National Economic Council. *See* Cass R. Sunstein, *The Office of Information and Regulatory Affairs: Myths and Realities*, 126 Harv. L. Rev. 1838, 1854–59 (2013) ("*OIRA Myths and Realities*"). If OIRA believes that an agency should reconsider a proposed action, OIRA may return the action with "a written explanation for [the] return setting forth the pertinent provision of [EO 12866] on which OIRA is relying," and the agency may respond in writing if the agency disagrees. EO 12866, § 6(b)(3).

In practice, such "return letters" are rare. OIRA appears to have issued only seven during the period between 1994 and 2000, and only twenty-eight since July 2001—periods in which OIRA reviewed thousands of proposed agency actions. *See* OIRA, OMB, Executive Office of the President, *OIRA Return Letters*, www.reginfo.gov/public/do/eoReturnLetters (last visited Oct. 8, 2019); Copeland, *Role of OIRA* at 19. More commonly, OIRA, the agency, and any other interested agencies discuss suggestions in an iterative revision process, with any disagreements percolating up through interagency committees of increasingly senior officials. Section 7 of EO 12866 provides for the President, or the Vice President acting at the request of the President, to resolve any remaining "disagreements or conflicts between or among agency heads or between OMB and any agency," "[t]o the extent permitted by law."

OIRA is a repository of valuable rulemaking expertise, and its views carry significant weight. *See* Sunstein, *OIRA Myths and Realities*, 126 Harv. L. Rev. at 1854–55. A wide range of commentators has recognized that OIRA's regulatory review process, which draws on the expertise of the entire government, has come to provide an "essential mechanism to ensure unity and coherence in execution of the law." OMB Letter at 4.[3]

---

[3] *See, e.g.*, Letter for Ron Johnson, Chairman, and Thomas R. Carper, Ranking Member, Senate Committee on Homeland Security and Governmental Affairs, from Thomas Susman, Director, Governmental Affairs Office, American Bar Association ("ABA"), *Re: Support for S. 1067, the "Independent Agency Regulatory Analysis Act of 2015"* at 2–3 (July 23, 2015) (centralized review ensures that "regulatory policy . . . is responsive to the interests of the public as a whole"); Sunstein, *OIRA Myths and Realities*, 126 Harv. L. Rev. at 1850 (centralized review allows "extremely important and valuable" interagency coordination); Sally Katzen, *OIRA at Thirty: Reflections and Recommendations*, 63

An agency may not publish or proceed with a proposed action (unless otherwise required to do so by law) without addressing the concerns expressed by OIRA or others during the review process, or elevating any disagreements to the President. *See* EO 12866, § 8. But EO 12866 does not authorize OIRA "to 'approve' or 'disapprove' a draft rule." Copeland, *Role of OIRA* at 14. Section 9 provides that "[n]othing in this order shall be construed as displacing the agencies' authorities or responsibilities, as authorized by law." *See also* EO 12866, pmbl. (providing that the order "reaffirm[s] the primacy of Federal agencies in the regulatory decision-making process" and that regulatory review "shall be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies"). Therefore, the OIRA review process, while mandatory, is also a consultative one, improving regulatory outcomes while preserving an agency's statutory discretion.

In adopting EO 12291, the Reagan Administration considered applying OIRA's regulatory review process to "independent regulatory agenc[ies]," as defined in 44 U.S.C. § 3502. At the time, this Office approved the legality of such a direction. *See* Memorandum for David Stockman, Director, OMB, from Larry L. Simms, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Executive Order on Federal Regulation* at 7 (Feb. 12, 1981) ("Simms Memorandum"), *reprinted in Role of OMB in Regulation: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 97th Cong. 152, 158 (1981) ("*Role of OMB Hearing*"). Even if Congress sought to limit "[p]residential supervision" of independent agencies "on matters of substantive policy," we advised that subjecting them to the proposed regulatory review process would be consistent with their independent

---

Admin. L. Rev. 103, 110 (2011) (centralized review results in "better coordinated and coherent regulatory actions, and ultimately better decisionmaking"); American Bar Association Section of Administrative Law and Regulatory Practice, *Twenty-First Century Governance: Improving the Federal Administrative Process: A Report for the President-Elect of the United States*, 52 Admin. L. Rev. 1099, 1104–05 (2000) (centralized review fosters "efficient, coordinated, yet reasonably open administration" and "promote[s] good government"); Christopher C. DeMuth & Douglas H. Ginsburg, *White House Review of Agency Rulemaking*, 99 Harv. L. Rev. 1075, 1081 (1986) (centralized review "encourages policy coordination, greater political accountability, and more balanced regulatory decisions").

status, because the order would preserve the agencies' "substantive discretion to decide particular . . . rulemaking matters." Simms Memorandum at 10, 11. Ultimately, however, the Reagan Administration determined, for "policy reasons," not to include independent agencies, even though the Administration believed the President had the constitutional power to do so. *Role of OMB Hearing* at 93–94 (quoting C. Boyden Gray, Counsel to the Vice President); *see also* Peter L. Strauss & Cass Sunstein, *The Role of the President and OMB in Informal Rulemaking*, 38 Admin. L. Rev. 181, 202 (1986) (same).

In EO 12866, President Clinton preserved the exemption for "independent regulatory agencies" from the centralized regulatory review process. EO 12866, § 3(b).[4] He did, however, require independent agencies to submit to OIRA annual regulatory agendas and plans, which summarize expected regulatory actions during the upcoming fiscal year. *Id.* § 4(b), (c). Sally Katzen, who was then the OIRA Administrator, later explained that the President's legal advisers believed it would have been lawful to apply the entirety of EO 12866 to independent agencies, but the Administration ultimately chose not to do so. Sally Katzen, *OIRA at Thirty: Reflections and Recommendations*, 63 Admin. L. Rev. 103, 109 (2011).[5]

EO 12866 thus continues to exempt independent regulatory agencies from the centralized regulatory review process. In the statutory definition incorporated into EO 12866, Congress has identified nineteen such independent agencies and included a catch-all clause for "any other similar agency designated by statute":

---

[4] EO 12291 and EO 12866 both cite 44 U.S.C. § 3502(10) for the definition of excluded independent regulatory agencies. EO 12291, § 1(d); EO 12866, §§ 3(b), 4(c). In 1995, Congress moved the relevant definition to 44 U.S.C. § 3502(5). *See* Paperwork Reduction Act of 1995, Pub. L. No. 104-13, sec. 2, 109 Stat. 163, 165.

[5] President George W. Bush amended EO 12866 twice, principally to reduce the Vice President's role, to instruct agencies to identify the specific market failure that any new regulations seek to remedy, and to expand OIRA's review of agency guidance documents. *See* Exec. Order No. 13258, 3 C.F.R. 204 (2003); Exec. Order No. 13422, 3 C.F.R. 191 (2008). President Obama revoked those modifications, *see* Exec. Order No. 13497, 3 C.F.R. 218 (2010), although OIRA continued its practice, which predated President Bush's orders, of reviewing agency guidance documents under EO 12866. *See* Memorandum for the Heads and Acting Heads of Executive Departments and Agencies, from Peter R. Orszag, Director, OMB, M-09-13, *Re: Guidance for Regulatory Review* (Mar. 4, 2009).

> [T]he Board of Governors of the Federal Reserve System, the Commodity Futures Trading Commission, the Consumer Product Safety Commission, the Federal Communications Commission, the Federal Deposit Insurance Corporation, the Federal Energy Regulatory Commission, the Federal Housing Finance Agency, the Federal Maritime Commission, the Federal Trade Commission, the Interstate Commerce Commission, the Mine Enforcement Safety and Health Review Commission, the National Labor Relations Board, the Nuclear Regulatory Commission, the Occupational Safety and Health Review Commission, the Postal Regulatory Commission, the Securities and Exchange Commission, the Bureau of Consumer Financial Protection, the Office of Financial Research, [the] Office of the Comptroller of the Currency, and any other similar agency designated by statute as a Federal independent regulatory agency or commission.

44 U.S.C. § 3502(5).[6] Consistent with the catch-all clause, Congress has deemed the U.S. International Trade Commission "an independent regulatory agency for purposes of chapter 35 of Title 44," which includes the provision quoted above. 19 U.S.C. § 1330(f). Congress has also identified other agencies as "independent" in their organic statutes. *See, e.g.*, 12 U.S.C. § 1752a(a) (National Credit Union Administration); *id.* § 2241 (Farm Credit Administration). We understand that some of those agencies regard themselves as independent regulatory agencies under section 3502(5).

## II.

Our review of the President's authority to direct independent regulatory agencies requires consideration of the scope of his authority to supervise the Executive Branch. Before addressing independent agencies, we first examine the President's constitutional authority to direct the departments

---

[6] The statute expressly provides that the Federal Election Commission and the Government Accountability Office shall not be considered "independent regulatory agencies" even if otherwise covered by the catch-all clause. 44 U.S.C. § 3502(1)(A), (B). In 1995, Congress abolished the Interstate Commerce Commission ("ICC") and provided that references to the ICC, like the one in 44 U.S.C. § 3502(5), shall be "deemed to refer" to its successor, the Surface Transportation Board. ICC Termination Act of 1995, Pub. L. No. 104-88, § 205, 109 Stat. 803, 943.

and agencies that are currently subject to centralized regulatory review. The source of the President's authority to supervise those departments and agencies bears directly upon his authority to direct independent agencies, which are also within the Executive Branch.

## A.

The "Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Free Enter. Fund*, 561 U.S. at 483 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Article II vests all of "[t]he executive Power" in the President and charges him alone with the responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. In carrying out that charge, the President must depend on "the assistance of subordinates," *Myers v. United States*, 272 U.S. 52, 117 (1926), and Article II includes specific provisions illustrating the President's supervisory authority. Thus, the President may "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," U.S. Const. art. II, § 2, cl. 1, and he appoints all "Officers of the United States" with the advice and consent of the Senate, subject to Congress's power to vest the authority to appoint inferior officers "in the President alone, in the Courts of Law, or in the Heads of Departments," *id.* art. II, § 2, cl. 2.

The Supreme Court has repeatedly explained that "Article II confers on the President 'the general administrative control of those executing the laws.'" *Free Enter. Fund*, 561 U.S. at 492 (quoting *Myers*, 272 U.S. at 164). As the Chief Executive, the President "may properly supervise and guide" subordinate officers in "their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Myers*, 272 U.S. at 135. According to Alexander Hamilton, executive officers "ought to be considered as the assistants or deputies of the chief magistrate; and, on this account, they ought to derive their offices from his appointment, at least from his nomination, and ought to be subject to his superintendence." *The Federalist* No. 72, at 487 (Jacob E. Cooke ed., 1961).

In providing for presidential control over the Executive Branch, the Constitution ensures not only that executive officers remain accountable

to the President, but also that the President remains accountable to the Nation. *See Printz v. United States*, 521 U.S. 898, 922 (1997) ("The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known."); *In re Aiken County*, 645 F.3d 428, 439 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("'What Article II *did* make emphatically clear from start to finish was that the president would be personally responsible for his branch.'" (quoting Akhil Reed Amar, *America's Constitution: A Biography* 197 (2005)).[7] Those principles are not empty formalities. The purpose "of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government, but to preserve individual freedom." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting); *see also Bond v. United States*, 564 U.S. 211, 222 (2011) ("The structural principles secured by the separation of powers protect the individual as well."). The President's supervision of the Executive Branch guarantees the people's right to select, and hold accountable, the one person responsible for the execution of federal law.

## B.

In 1981, this Office reviewed the proposed EO 12291 and confirmed that the President may require agencies to participate in the OMB review process. *See Proposed Executive Order Entitled "Federal Regulation*," 5 Op. O.L.C. 59, 60 (1981) ("EO 12291 Opinion"). We explained that the President has the "distinctive constitutional role" of supervising the execution of federal law, and he could not take care that the entire "mass of legislation" is executed faithfully, in a consistent and uniform manner, absent authority to guide and direct his subordinates. *Id.* at 60–61 (internal quotation marks omitted); *see also* Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*,

---

[7] *See also* 1 Annals of Cong. 462 (1789) (Rep. James Madison) ("It is evidently the intention of the Constitution, that the first Magistrate should be responsible for the executive department; so far therefore as we do not make the officers who are to aid him in the duties of that department responsible to him, he is not responsible to his country."); 1 *Collected Works of James Wilson* 730 (Kermit L. Hall & Mark David Hall eds., 2007) ("In the United States, our first executive magistrate is not obnubilated behind the mysterious obscurity of counsellors. . . . He is the dignified, but accountable magistrate of a free and great people."); 2 *id.* at 873 ("[I]n the executive department, the principle of unity is adopted.").

84 Colum. L. Rev. 573, 642 (1984) ("[T]he execution of not a single law but many inevitably raises questions of priority, conflict, and coordination . . . . Attending to these conflicts seems an inevitable aspect of a chief executive's function."). That is also true when agencies execute federal law by promulgating rules. *See, e.g.*, *Sierra Club v. Costle*, 657 F.2d 298, 405–06 (D.C. Cir. 1981) (recognizing that the President must be allowed to "control and supervise" rulemakings). Thus, under his constitutional authority to supervise the execution of federal law, the President may establish both general principles for agencies to follow in rulemaking, such as cost-benefit principles, *see* EO 12866, § 1(b), and administrative mechanisms to effectuate those principles, such as centralized regulatory review, *see id*. § 6.

The President may also require any agency to submit in writing an analysis of proposed agency action under the Opinions Clause, which authorizes the President to "require [an] Opinion, in writing," from the principal officers in the Executive Branch on "any Subject" relating to "the duties of their . . . offices." U.S. Const. art. II, § 2, cl. 1; *see also* EO 12291 Opinion, 5 Op. O.L.C. at 62. The Opinions Clause ensures that the President may obtain the advice he needs to order the affairs of the Executive Branch, including the counsel necessary to direct the heads of agencies in the exercise of their statutory functions. The Opinions Clause therefore sets him up as "Chief Administrator of the Executive Bureaucracy" and confirms that "[e]xecutive departments are accountable to the Chief Executive." Akhil Reed Amar, *Some Opinions on the Opinion Clause*, 82 Va. L. Rev. 647, 652, 658 (1996).[8] In the view of then-Professor Elena Kagan, the Opinions Clause "supports OMB review of at least executive agency (and perhaps independent agency) actions, so long as the ultimate decisionmaking power resides in the hands of agency officials; the [regulatory] review system then operates as a channel through which the President can obtain information from and offer advice to the relevant adminis-

---

[8] *See also* Amar, *Some Opinions*, 82 Va. L. Rev. at 661 ("[T]he Opinion Clause clearly exemplifies the President's supervisory power over the executive departments."); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Law*, 104 Yale L. J. 541, 584 (1994) ("[T]he Opinions Clause empowers the President to obtain information in writing on government matters precisely so he will be able to issue binding orders to his subordinates."); Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 62 ("The duty to report is meaningful only if the President retains a measure of substantive authority over the doings of the agency.").

trators." Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2325. By requiring his subordinates to provide their opinions on proposed regulatory actions, the President may receive the advice he needs to "properly supervise and guide the[] construction of the statutes" under which his subordinates act, *Myers*, 272 U.S. at 135, and thereby "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

## C.

While the President must supervise the faithful execution of the laws, Congress has the authority to define the structure of the Executive Branch and the responsibilities of its officers. In our published 1981 opinion, we advised that "the President's exercise of supervisory powers must conform to legislation enacted by Congress," and "may not, as a general proposition, require or permit agencies to transgress boundaries set by Congress." EO 12291 Opinion, 5 Op. O.L.C. at 61.[9] Yet it is equally true that Congress may not "impede the President's ability to perform his constitutional duty" under the Take Care Clause. *Morrison*, 487 U.S. at 691; *see also* Statement on Signing a Bill Concerning the Protection of

---

[9] Our 1981 opinion recognized that "[i]n certain circumstances, statutes could invade or intrude impermissibly upon the President's 'inherent' powers," but concluded that "that issue [did] not arise" because Congress had not forbidden presidential direction under EO 12291. EO 12291 Opinion, 5 Op. O.L.C. at 61 n.3. In a later memorandum to OMB, this Office considered the scope of congressional authority to exempt independent agencies from regulatory review. *See* Memorandum for Preeta D. Bansal, General Counsel and Senior Policy Adviser, Office of Management and Budget, from David Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Regulatory Review and Coordination for Independent Agencies* at 11–17 (Sept. 3, 2009). We advised that "we certainly cannot rule out the possibility that precluding Presidential supervision in the context of a particular statutory regime might transgress whatever minimum quantum of supervisory authority is required under *Morrison*," *id*. at 16–17, but we declined to "resolve definitively the difficult and unsettled constitutional and statutory questions raised" by such a proposal, *id*. at 18. The Barron Memorandum cautioned that directing independent agencies under EO 12866 might be "legally controversial" and advised against any "definitive conclusion" absent a concrete examination of a particular agency's governing statutes. *Id*. at 1. As discussed below in Part III, we do not believe that any of the features generally associated with agency independence would restrict a presidential direction for independent agencies to comply with EO 12866. But under the terms of EO 12866 itself, if an agency (be it independent or otherwise) has a specific statutory provision that conflicts with the general directives under EO 12866, then that specific statutory provision will control. *See* EO 12866, § 9; *infra* Part IV.

Marine Mammals (Oct. 9, 1981), 1 *Pub*. *Papers of Pres*. *Ronald Reagan* 914, 914 (1981) (noting that a statute exempting certain rulemakings from EO 12291 "should not be read to infringe in any way on the President's constitutional responsibility to supervise the Secretary of Commerce and the Secretary of the Interior in their execution of the law").

EO 12866, however, conflicts with no statute. On the contrary, the order directs that the regulatory review process "shall be conducted so as to meet applicable statutory requirements." EO 12866, pmbl. An agency must follow the order's overarching principles "unless a statute requires another regulatory approach," *id*. § 1(a), and several of its operative provisions contain similar caveats. For instance, the agency need not analyze and quantify potential economic costs where Congress has prohibited such consideration, *id*. § 6(a)(3)(C), and the agency must measure the rule against the President's priorities only "to the extent permitted by law," *id*. § 6(a)(3)(B)(ii).

EO 12866 also preserves the statutory discretion vested in the agency. In our 1981 opinion, we concluded that EO 12291 did "not purport wholly to displace, but only to guide and limit, discretion which Congress has allocated to a particular subordinate official." EO 12291 Opinion, 5 Op. O.L.C. at 61. So too, EO 12866 channels an agency's discretion by requiring the agency to follow the President's regulatory principles and to submit the proposed rule for OIRA's review. However, nothing in the order "shall be construed as displacing the agencies' authority or responsibilities, as authorized by law." EO 12866, § 9. The order allows OIRA to return a proposed regulatory action to an agency for reconsideration, *id*. § 6(b)(3), but the order does not authorize OIRA to veto a proposed action. OIRA exercises only a "power of consultation"—a significant power, to be sure, but not the "authority to reject an agency's ultimate judgment." EO 12291 Opinion, 5 Op. O.L.C. at 64. Thus, subject to the guidance set by the order, "the authority to make the ultimate decision rests where Congress has placed it—in the relevant agency." Strauss & Sunstein, *Role of the President*, 38 Admin. L. Rev. at 191.

EO 12866 similarly confirms that it is the President, rather than OMB, who exercises the final authority to direct agency action, with section 7 contemplating presidential resolution of any unresolved disputes. This is consistent with the President's constitutional supervisory authority under Article II, which may not be delegated. *See Centralizing Border Control*

*Policy Under the Supervision of the Attorney General*, 26 Op. O.L.C. 22, 24–25 (2002); *cf. Free Enter. Fund*, 561 U.S. at 496–97 ("[T]he President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it, because Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks omitted)). At the same time, the President "may tap advisers within the White House" (and within agencies) to assist him in implementing presidential policies within the Executive Branch. *Centralizing Border Control Policy*, 26 Op. O.L.C. at 26. EO 12866 designates OIRA to coordinate and implement regulatory policy, while ensuring that agencies retain the authority provided by the laws enacted by Congress, under the ultimate supervision of the President.

## III.

The President's constitutional authority to direct traditional executive agencies under EO 12866 also extends to the "independent regulatory agenc[ies]" identified in 44 U.S.C. § 3502(5). All of those agencies remain part of the Executive Branch and subject to his superintendence. Although Congress has sought to limit the President's authority to remove the heads of some of those agencies, such limits on removal do not preclude the President from requiring the agencies to comply with EO 12866. Nor do the other hallmarks of agency "independence," such as multi-member governance, independent litigating authority, or open-meeting requirements. The President has long required independent regulatory agencies to submit an annual regulatory plan and agenda under section 4 of EO 12866. Congress has not otherwise sought to shield such agencies, as a general matter, from complying with the order's other requirements, and we see no persuasive grounds to infer such an unstated limitation on the President's supervisory authority.

## A.

We begin again with the text of the Constitution. The "executive Power" vested in the President and his constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 1, cl. 1; *id*. § 3, do not vanish merely because the subordinate charged with executing the law may enjoy tenure or other protections. The "Constitution requires that a President chosen by the entire Nation oversee the execution of the laws."

*Free Enter. Fund*, 561 U.S. at 499. Even when an officer heads an independent agency, the President's obligation to "take Care that the Laws be faithfully executed" still requires that he "oversee the faithfulness of the officers who execute them." *Id.* at 484; *see also id.* at 492 (quoting James Madison's observation in the First Congress that "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws"); *Morrison*, 487 U.S. at 696 (recognizing that the President must have "sufficient control" over all officers who execute the law).

The Supreme Court has confirmed that the President must have some constitutional authority to remove all those executive officers whom he appoints, including the heads of independent agencies. *See Free Enter. Fund*, 561 U.S. at 493 ("As we explained in *Myers*, the President . . . must have some 'power of removing those for whom he can not continue to be responsible.'"). It is true that the Court has upheld some statutory limits on those removal powers. *See Wiener v. United States*, 357 U.S. 349, 353 (1958); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). But even the authority to remove an official for statutorily identified causes "presupposes that the officer or body that has the removal power must supervise the subordinate officer at least to the extent needed to determine whether 'cause' for removal exists." *Applicability of Executive Order 12674 to Personnel of Regional Fishery Management Councils*, 17 Op. O.L.C. 150, 156 n.19 (1993); *see also Morrison*, 487 U.S. at 692–93 (stating that the power to terminate an independent counsel for good cause allowed "ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act"). The President could not fulfill this responsibility without the power to review the work of independent agencies and, to some degree, to direct the faithful performance of their duties.

The Opinions Clause, likewise, supports presidential oversight of the "principal Officer in each of the executive Departments," including the independent agencies. U.S. Const. art. II, § 2, cl. 1. In *Free Enterprise Fund*, the Court had little trouble concluding that the Securities and Exchange Commission ("SEC")—whose members were assumed to have tenure protection—"constitutes a 'Departmen[t]' for purposes of the Appointments Clause." 561 U.S. at 487, 511. In a footnote, the Court "express[ed] no view on" whether the Commission should be considered an "executive Departmen[t]" under the Opinions Clause. *Id.* at 511 n.11.

But the Court previously declared that the "word 'department'" in the two clauses "clearly means the same thing, and the principal officer in the one case is the equivalent of the head of department in the other." *United States v. Germaine*, 99 U.S. (9 Otto) 508, 511 (1879); *see also Freytag v. Comm'r*, 501 U.S. 868, 918 (1991) (Scalia, J., concurring in part and concurring in the judgment) (finding it "quite likely that the 'Departments' referred to in the Opinions Clause . . . are the same as the 'Departments' in the Appointments Clause").[10] The President therefore may "require" the heads of independent regulatory agencies to give an opinion in writing on "any Subject relating to the duties of their respective Offices," U.S. Const. art. II, § 2, cl. 1, including opinions on the regulatory impact of significant actions, as required by section 6 of EO 12866. As discussed above, the Opinions Clause, consistent with the President's supervisory authority, further implies that the President may direct the head of an independent regulatory agency to consult with the President and his advisers prior to exercising the agency's discretion in the rulemaking process.

These principles led us to conclude in 1981 that President Reagan could have applied EO 12291 to independent agencies. *See* Simms Memorandum at 10–12; *supra* Part I. We acknowledged that Congress often "intends the independent agencies to be free of Presidential supervision on

---

[10] Indeed, that commonsense conclusion also follows from the Court's recognition that "[t]he object of the constitution was to establish three great departments of government; the legislative, the executive, and the judicial departments." *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 329 (1816). During the Washington Administration, the Justices of the Supreme Court embraced that same understanding, advising that the Opinions Clause "seems to have been *purposely* as well as expressly limited to *executive* Departments," thereby implicitly excluding the judicial department. Letter from Justices of the Supreme Court to George Washington (Aug. 8, 1793), *reprinted in* 6 *The Documentary History of the Supreme Court of the United States, 1787–1800*, at 755 (Maeva Marcus ed., 1998). With only three "great departments" to choose from, it is apparent that independent agencies that execute federal law are part of the "executive Departments" and subject to the Opinions Clause. We note that the ratification history of the Twenty-Fifth Amendment may suggest a different reading for the "principal officers of the executive departments" mentioned there, but the 1967 ratification of that amendment does not illuminate the original meaning of Article II. *See Freytag*, 501 U.S. at 886–87 (citing pre-ratification evidence that "the principal officers" under the Twenty-Fifth Amendment were limited to members of the Cabinet); *id.* at 917 (Scalia, J., concurring in part and concurring in the judgment) (distinguishing "the principal officers" in the Twenty-Fifth Amendment from the similar language in the Opinions Clause).

matters of substantive policy," but we viewed EO 12291 as consistent with that legislative intent because the order preserved the agencies' "substantive discretion to decide particular . . . rulemaking matters." Simms Memorandum at 10, 11. Considering costs and benefits, where permitted by statute, and submitting proposed agency actions to OIRA would not "displace the agencies' ultimate discretion to decide what rule best fulfills their statutory responsibilities." *Id*. at 12.

We reached a similar conclusion in 1995, when we advised the White House that EO 12866 could be applied to the Social Security Administration ("SSA"), even though Congress had recently given the Commissioner a six-year term in office and statutory protection from removal. *See* 42 U.S.C. § 902(a)(3); *see also* 42 U.S.C. § 904(b)(1)(A) (requiring that the SSA's budget "be submitted by the President to the Congress without revision"). Our file memorandum recording this informal advice noted that the removal restriction, if valid, might limit the extent to which the President could "order[] the [SSA Commissioner] to take a particular substantive policy position" in a proposed action submitted for review under section 6 of EO 12866. Memorandum for the Files, *Re: OMB Review of Regulations of the Social Security Administration* at 5 (Aug. 7, 1995). But the President could nonetheless "tell the SSA to submit the proposed rule to OIRA, because that [directive] . . . would not displace the SSA's ultimate discretion to promulgate regulations it considers appropriate." *Id*. at 7. We noted that permitting at least that degree of supervision "may in fact be constitutionally compelled" under Article II. *Id*. Consistent with this Office's advice, EO 12866 continued to apply to the SSA, which we understand has participated in the regulatory review process in the years since. That history confirms that the presidential supervision under EO 12866 is consistent with statutory tenure protection. *See also supra* p. 6 (noting that President Clinton's legal advisers concluded that EO 12866 could be applied to independent regulatory agencies).

Thus, in the past, we have advised that both EO 12291 and EO 12866 could have been applied to independent agencies. Such advice is consistent with our long-standing view that the President "may exercise a certain amount of managerial authority" over independent agencies and "under penalty of removal 'may exact reasonable efficiency and absolute integrity'" from independent agencies. *Applicability of Executive Privilege to Independent Regulatory Agencies*, 1 Op. O.L.C. Supp. 170, 172, 190 (Nov. 5, 1957) (quoting Robert E. Cushman, *The Independent Regu-*

*latory Commissions* 464 (1941)).[11] The President may "'force an independent regulatory commission to comply with executive orders of general application unless Congress clearly indicates that such orders should not apply.'" *Id*. at 190 (quoting Cushman, *Independent Regulatory Commissions* at 465). The President's supervisory authority extends to all officers charged with executing the laws of the United States, and we will not lightly presume that Congress has sought to displace it.

## B.

EO 12866 does not seek to displace any statutory mandate. To the contrary, the order itself is limited so that it requires agencies to follow its principles and procedures "unless a statute requires another regulatory approach," EO 12866, § 1(a), and only "to the extent permitted by law," *id*. § 6(a)(3)(B)(ii). To address how the order applies to independent agencies, we thus must consider whether the common statutory hallmarks of independence themselves would conflict with the kind of presidential supervision required by EO 12866's regulatory review process.

In doing so, we are guided by the principle that "a clear statement of congressional intent" is ordinarily required before a statute will be read in a manner that raises separation of powers concerns. *Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op. O.L.C. 109, 112 (1997); *see also, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) ("We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) ("When Congress decides purposefully to enact legislation restricting or regulating presiden-

---

[11] In 1977, our Office also concluded that the President could issue an executive order that would require independent agencies to "perform [their quasi-legislative and judicial] functions efficiently and without undue delay" and "take into account the economic impact of their decisions," although we suggested that the President "probably cannot dictate the precise effect the agencies are to give to that impact," in view of what we called then, in a nod to *Humphrey's Executor*, "the agencies' quasi-legislative autonomy." Memorandum for Simon Lazarus, Associate Director, Domestic Council, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: President's Authority to Impose Procedural Reforms on the Independent Regulatory Agencies* at 2, 3 (July 22, 1977). In view of subsequent decisions of the Supreme Court, as well as opinions of this Office, we do not read *Humphrey's Executor* so broadly. *See infra* pp. 20–23.

tial action, it must make its intent clear."); *Applicability of Executive Privilege to Independent Regulatory Agencies*, 1 Op. O.L.C. Supp. at 190 (stating that Congress must "'clearly indicate[]'" that executive orders of general applicability do not apply to independent agencies if it seeks to impose such a limitation). We think it clear that any effort by Congress to insulate an executive officer from presidential supervision would raise such separation of powers concerns. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 499; *Morrison*, 487 U.S. at 691. That principle has particular force here because, on occasion, Congress has expressly sought to preclude OIRA review of some rulemakings. *See supra* Part II.C (citing President Reagan's 1981 signing statement regarding a bill that precluded the application of EO 12291); *see also* Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, div. C, tit. II, 125 Stat. 786, 894 (2011) (appropriating funds to OMB provided that "none of the funds . . . may be used for the purpose of reviewing any agricultural marketing orders or any . . . regulations under the provisions of the Agricultural Marketing Agreement Act of 1937"); Copeland, *Role of OIRA* at 25 (discussing these examples). Absent such a clear statement, we will not presume that Congress sought to limit the President's supervisory authority.

## C.

We proceed to examine the distinctive statutory features commonly thought to define agency independence. Chief among those is tenure protection, which is often described as "[t]he distinguishing characteristic" that makes an agency "independent." Simms Memorandum at 8. Many independent agencies are headed by officials covered by such a provision. *See, e.g.*, 15 U.S.C. § 41 (members of the Federal Trade Commission "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office"); *id.* § 2053(a) (members of the Consumer Product Safety Commission "may be removed by the President for neglect of duty or malfeasance in office but for no other cause"); 42 U.S.C. § 7171(b)(1) (members of the Federal Energy Regulatory Commission "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office").[12] But the statutory limits on the President's

---

[12] Several independent regulatory agencies are headed by officers who do not enjoy any express protection against removal without cause: the Commodity Futures Trading

authority to remove the head of an agency do not preclude the President from requiring independent agencies to comply with EO 12866, much less do so clearly. Requiring an agency to comply with EO 12866 would not conflict with those statutes, which do not preclude, and indeed presume, ongoing presidential supervision of the agency.

The Supreme Court's decision in *Humphrey's Executor* serves as the foundation for any argument to the contrary. In *Humphrey's Executor*, the Court addressed whether Congress could prohibit the removal without cause of members of the Federal Trade Commission ("FTC"). In contrast with a "purely executive" officer, such as the postmaster whose job was at issue in *Myers*, *Humphrey's Executor* concluded that the FTC exercised what it described as "quasi-legislative" and "quasi-judicial" functions, 295 U.S. at 629, and the Constitution did not grant the President an "illimitable power of removal" over such officers. *Id.*; *see also Wiener*, 357 U.S. at 353–54 (interpreting a statute to provide tenure protection to members of the War Claims Commission, an agency with adjudicative functions).

In the course of upholding the lawfulness of such a restriction, the Court in *Humphrey's Executor* spoke in sweeping terms about the congressional intent underlying the FTC Act:

---

Commission, the Federal Communications Commission, the Office of Financial Research, and the SEC. *But cf. Free Enter. Fund*, 561 U.S. at 487 (assuming that SEC members can be removed only for cause); *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988) (same). The President may remove the Comptroller of the Currency only "upon reasons to be communicated by him to the Senate," 12 U.S.C. § 2, but no statute purports to limit the permissible reasons for removal. And no statute expressly limits the President's authority to remove the three appointed (i.e., non-ex-officio) members of the Federal Deposit Insurance Corporation. In *Wiener*, the Supreme Court held that the President could remove members of the War Claims Commission only for cause even though Congress concededly "said nothing about it." 357 U.S. at 356. But we have questioned that conclusion and advised that "the executive branch should resist any further application" of *Wiener* outside the context of purely adjudicatory bodies. *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 170 (1996) ("*Separation of Powers*"); *see also Holdover and Removal of Members of Amtrak's Reform Board*, 27 Op. O.L.C. 163, 166 (2003) ("Because the removal power is a principal means by which the President carries out the executive power and takes care that the laws be faithfully executed, we do not believe that any restrictions on the President's removal power should be inferred.").

> [T]he language of the [FTC Act], the legislative reports, and the general purposes of the legislation as reflected by the debates, all combine to demonstrate the Congressional intent to create a body of experts who shall gain experience by length of service—a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government. To the accomplishment of these purposes, it is clear that Congress was of opinion that length and certainty of tenure would vitally contribute. And to hold that, nevertheless, the members of the commission continue in office at the mere will of the President, might be to thwart, in large measure, the very ends which Congress sought to realize by definitely fixing the term of office.

295 U.S. at 625–26 (emphasis omitted); *see also id*. at 628 (stating that the FTC's duties "are performed without executive leave and, in the contemplation of the statute, must be free from executive control"). If this view were "taken at face value, the President's constitutional power to supervise" the "body of experts" at the independent agencies would be "limited to his power of appointment," Simms Memorandum at 9, and he could no more supervise their "quasi-judicial" and "quasi-legislative" work than he could the judgments of his appointees to the Article III courts. This view would not only preclude the President from requiring agencies to submit proposed regulations to OIRA, but it would also bar any presidential directives at all, including the well-established requirement that independent agencies submit an annual regulatory plan and agenda under section 4 of EO 12866.

We cannot read *Humphrey's Executor* so broadly. To begin with, the quoted passage is dictum. As then-Professor Kagan explained, the "question actually decided in the case was much narrower" than its reasoning, and "the Court did not hold that Congress could cut off agencies in all respects from the President." Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2325 n.311. The Court held only that Congress had validly limited the President's grounds for removing the Commissioner to "inefficiency, neglect of duty, or malfeasance in office," 295 U.S. at 623, and that the President had violated the statute by removing him without citing any of those grounds.

Subsequent decisions confirm that independent agencies execute federal law and are part of the Executive Branch—not a "headless 'fourth branch' of the Government." President's Committee on Administrative Management, *Administrative Management in the Government of the United States* 36 (Jan. 1937); *see, e.g.*, *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) ("Agencies make rules . . . and conduct adjudications," but those activities "are exercises of—indeed under our constitutional structure they *must be* exercises of—the 'executive Power.'"); *Free Enter. Fund*, 561 U.S. at 510–11 (holding that the SEC is an executive "Department[]" under the Appointments Clause); *Morrison*, 487 U.S. at 690 n.28 ("[I]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree."); *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983) (recognizing that agency rulemaking is an executive function, not a legislative function); *Buckley v. Valeo*, 424 U.S. 1, 125–28 (1976) (per curiam) (holding that members of the Federal Election Commission are executive officers, not officers of Congress); *Separation of Powers*, 20 Op. O.L.C. at 168 n.116 ("We do not think that the 'independent' regulatory agencies could be viewed today as within the legislative or judicial branches." (citing *Mistretta v. United States*, 488 U.S. 361, 387 n.14 (1989))); *Applicability of Executive Privilege to Independent Regulatory Agencies*, 1 Op. O.L.C. Supp. at 171–72 ("[*Humphrey's Executor*] cannot be invoked as a complete charter of independence of the regulatory commissions from executive control."). While *Humphrey's Executor* spoke of the "quasi-legislative" and "quasi-judicial" functions of independent agencies, 295 U.S. at 628–29, there can now be no doubt that independent agencies are part of the Executive Branch.

In addition, the dictum of *Humphrey's Executor* conflicts not only with subsequent decisions, but also with the very statute at issue in that case. The Court's claim that the FTC "shall be independent of executive authority, *except in its selection*," 295 U.S. at 625, is demonstrably incorrect. Congress gave the President authority to remove FTC Commissioners for "inefficiency, neglect of duty, or malfeasance in office," *id*. at 619, terms that presuppose presidential supervision of the actions of those whom he may remove. Thus, the President's authority over the officers of the FTC continues well beyond the time of selection. The same is true of any independent agency whose head or heads are removable by the President for cause.

*Humphrey's Executor* also rested on an "outmoded view" of independent agencies as apolitical experts. Simms Memorandum at 10. "[I]ndependent agencies . . . have to make a slew of non-scientific legal and policy judgments—such as how to interpret governing statutes, how to exercise policy discretion under those statutes, and whom to charge for violations of the law." *Aiken County*, 645 F.3d at 442 n.2 (Kavanaugh, J., concurring). Indeed, "[i]t is now recognized that rulemaking may legitimately reflect political influences of certain kinds from a number of sources, including Congress and the affected public." Simms Memorandum at 10. It thus makes little sense to presume that Congress intended to divorce such agencies entirely from presidential supervision.

In the decades since *Humphrey's Executor*, Congress itself has ensured that independent agencies are not "independent of executive authority." 295 U.S. at 625. Under the Paperwork Reduction Act, Congress has required independent agencies to submit proposed information requests to OIRA for review. 44 U.S.C. §§ 3502(1), 3507(a), (f). Under the Congressional Review Act, independent agencies must submit "major rules" to Congress before the rules "can take effect." 5 U.S.C. §§ 801(a)(1)(A), 804(1). Consistent with EO 12866, the statute requires OIRA to review these regulations and determine whether they are "major" under the statute. *Id*. § 804(2). Congress has also required independent agencies to comply with the Regulatory Flexibility Act, *see id*. § 601(1), and the Data Quality Act, *see* Pub. L. No. 106-554, div. C, § 515, 114 Stat. 2763, 2763A-153 to -154 (2000)—the latter of which charged OMB with issuing guidelines to all agencies to ensure data quality and integrity. Accordingly, over the past 80 years, Congress has repeatedly confirmed that independent agencies are part of the Executive Branch and subject to "executive authority."

For these reasons, we do not believe that the vision of independence suggested by *Humphrey's Executor* accurately describes the current state of the law. At the same time, we acknowledge that the Court has suggested on occasion that removal restrictions provide an agency head with some measure of independence from the President. *See Free Enter. Fund*, 561 U.S. at 502 (suggesting that "simple disagreement with . . . policies or priorities" may not constitute cause for removal); *Fox Television Stations*, 556 U.S. at 523 (recognizing that "independent agencies" have been "sheltered . . . from the President"); *Mistretta*, 488 U.S. at 410–11 (describing for-cause limitations on removal as "specifically crafted to

prevent the President from exercising 'coercive influence' over independent agencies").[13] And even some independent regulatory agencies without express tenure protection for their heads, such as the SEC, have historically enjoyed a broader degree of political independence than other executive agencies. *See Free Enter. Fund*, 561 U.S. at 547 (Breyer, J., dissenting) (noting the "political environment" protecting the independence of some agencies).

We believe, however, that those decisions are consistent with EO 12866, which "does not purport wholly to displace, but only to guide and limit, discretion which Congress has allocated to a particular subordinate official." EO 12291 Opinion, 5 Op. O.L.C. at 61. EO 12866 does not supplant an independent agency's discretion any more than it does for a "non-independent" agency. To the contrary, the order "reaffirm[s] the primacy of Federal agencies in the regulatory decision-making process" and directs that regulatory review "be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies." EO 12866, pmbl. Regardless of whether an agency is "independent," the President's authority to supervise all those who execute federal law must permit him, at the least, to require that agencies consult with his senior advisers to ensure that the agencies adhere to principles of sound governance and law. We therefore conclude that a for-cause limitation on removal does not preclude the President

---

[13] Other decisions of the Supreme Court have suggested a broader concept of what constitutes "cause" for removal under particular statutes. *See Morrison*, 487 U.S. at 692 (describing the power to remove for cause as conferring "ample authority to assure" that a subordinate "is competently performing his or her statutory responsibilities"); *Bowsher*, 478 U.S. at 729 (stating that the terms in a for-cause removal provision "are very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will"). Our Office too has favored the broader understanding, in large part to avoid constitutional concerns. *See, e.g.*, *Separation of Powers*, 20 Op. O.L.C. at 169 n.117 ("[A] generous reading of the President's . . . power to remove an inferior officer may be essential to the constitutionality of removal restrictions."); Memorandum for Roger Pauley, Director, Office of Legislation, Criminal Division, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 101, Lobbying Disclosure Act* at 1 (July 17, 1995) (legislation proposing "for cause" removal protection for an executive officer "might well be . . . unconstitutional" if it "were interpreted to bar the President from discharging the [officer] for failure to carry out the Administration's policies"). We have no occasion here to consider whether the refusal of an agency head to comply with a presidential directive under EO 12866 would constitute cause for removal.

from applying the OIRA review process under EO 12866 to an independent agency.

**D.**

Congress has adopted other statutory mechanisms to provide independent regulatory agencies with a degree of insulation within the Executive Branch. Those mechanisms include fixed terms in office for the agency head, distinct from the President's term; composition as a multi-member bipartisan board with staggered terms of office; the authority to submit testimony or proposed budgets to Congress without OMB review; and independent litigating authority. *See* Marshall J. Breger & Gary J. Edles, *Independent Agencies in the United States* 93–95, 163–175 (2015); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 789–808 (2013); David E. Lewis & Jennifer L. Selin, *Sourcebook of United States Executive Agencies* 88–106 (2d ed. Oct. 2018). Those features are not universally shared by all the independent regulatory agencies in 44 U.S.C. § 3502(5), nor are they unique to those agencies. But they are common enough that we consider here whether any would conflict with the centralized review process of EO 12866. We conclude that they do not.

1. *Multi-member, Bipartisan Agency Governance*. The statutes structuring some independent regulatory agencies as multi-member boards, with staggered terms and bipartisan membership, do not limit the President's authority to require those agencies to comply with EO 12866. *See, e.g.*, 7 U.S.C. § 2(a)(2)(A) (establishing the Commodity Futures Trading Commission as "an independent agency of the United States Government" composed of "five Commissioners," "[n]ot more than three of [whom] shall be members of the same political party," each serving "a term of five years" expiring at staggered one-year intervals); 15 U.S.C. § 78d(a) (similar provisions for the SEC). Requiring an independent regulatory agency to submit its proposed rules to OIRA for review is consistent with those structural features. The SEC, for example, will continue to be headed by a five-member, bipartisan board as required by statute, whether or not the President directs the Commission to comply with EO 12866.

One might argue that Congress chose to delegate rulemaking authority to an agency headed by a multi-member, bipartisan board "to minimize

presidential interference." EO 12291 Opinion, 5 O.L.C. Op. at 61. But we would not overstate the degree of insulation. In most instances, the President retains the statutory authority to select the board's chair, ensuring that he may put his stamp on the agency's policymaking agenda.[14] In addition, EO 12866 preserves an agency's ultimate discretion and thus respects Congress's judgment to entrust particular rulemakings to a commission rather than a traditional executive agency. Subject to appropriate consultation, the commission still makes the final decision under EO 12866. We see no persuasive grounds to infer from the multi-member structure of an independent regulatory agency any additional limits on presidential supervision that would bar the application of EO 12866 to the agency.

2. *Independent Litigating Authority*. For similar reasons, EO 12866 would not conflict with the authority of an agency to litigate independently of the Department of Justice when the agency has been given such authority. *See, e.g.*, 12 U.S.C. § 5564 (Bureau of Consumer Financial Protection ("CFPB")). Such authority does not imply that there are any statutory limits upon presidential supervision of agency rulemaking. EO 12866's centralized review process applies only to regulatory actions that promulgate or are expected to lead to the promulgation of "a final rule or regulation." EO 12866, § 3(e); *supra* note 2. Thus, the order does not cover agency litigation decisions or decisions to seek judicial enforce-

---

[14] *See, e.g.*, 29 U.S.C. § 153(a) ("The President shall designate one member [of the National Labor Relations Board] to serve as Chairman of the Board."); 42 U.S.C. § 5841(a)(1) ("The President shall designate one member of the [Nuclear Regulatory] Commission as Chairman thereof to serve as such during the pleasure of the President."); 42 U.S.C. § 7171(b)(1) ("One of the members [of the Federal Energy Regulatory Commission] shall be designated by the President as Chairman."); 46 U.S.C. § 301(c)(1) ("The President shall designate one of the Commissioners [of the Federal Maritime Commission] as Chairman."); 47 U.S.C. § 154(a) ("The Federal Communications Commission . . . shall be composed of five commissioners appointed by the President, by and with the advice and consent of the Senate, one of whom the President shall designate as chairman."); Reorg. Plan No. 10 of 1950, § 3, 64 Stat. 1265, 1266 (effective May 24, 1950) ("The functions of the [Securities and Exchange] Commission with respect to choosing a Chairman from among the commissioners composing the Commission are hereby transferred to the President."); Reorg. Plan No. 8 of 1950, § 3, 64 Stat. 1264, 1265 (effective May 24, 1950) ("The functions of the [Federal Trade] Commission with respect to choosing a Chairman from among the membership of the Commission are hereby transferred to the President.").

ment, and agencies with independent litigating authority will exercise that authority without OMB or OIRA review. In fact, Congress has given Cabinet departments independent litigating authority in limited circumstances, *see, e.g.*, 29 U.S.C. § 216(e)(3)(B) (Department of Labor), yet those agencies have long been subject to EO 12866.

3. *OMB Bypass Authority*. Congress has given some independent regulatory agencies the authority to bypass OMB by submitting reports, budgets, or testimony directly to Congress without prior OMB review. For the CFPB, for example, Congress provided that

> [n]o officer or agency of the United States shall have any authority to require the Director or any other officer of the Bureau to submit legislative recommendations, or testimony or comments on legislation, to any officer or agency of the United States for approval, comments, or review prior to the submission of such recommendations, testimony, or comments to the Congress[.]

12 U.S.C. § 5492(c)(4); *see also, e.g.*, 12 U.S.C. § 250 (similar provision covering the "the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Comptroller of the Currency, . . . the Director of the Federal Housing Finance Agency, [and] the National Credit Union Administration"); 49 U.S.C. § 1303(d) (Surface Transportation Board). Although these statutes do not mention OMB by name, OMB has long operated the executive branch clearance processes that these statutes allow agencies to bypass. *See* OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (2017); OMB Circular No. A-19, *Legislative Coordination and Clearance* (1979). In other instances, Congress has effectively prohibited advance OMB review by directing that an independent regulatory agency's budget requests, prepared testimony, or legislative proposals be submitted concurrently to Congress whenever they are submitted to OMB. *See, e.g.*, 7 U.S.C. § 2(a)(10)(A) (Commodity Futures Trading Commission); 15 U.S.C. § 2076(k)(1) (Consumer Products Safety Commission); 42 U.S.C. § 7171(j) (Federal Energy Regulatory Commission).

The Executive Branch has long objected to efforts to minimize presidential supervision of the agencies in testifying and submitting proposed legislation to Congress, treating those restrictions as an infringement of the President's Article II authority, including his Article II, Section 3

authority to recommend to Congress "such Measures as he shall judge necessary and expedient." *See, e.g.*, *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27, 28 (2008) ("For decades, the Executive Branch has consistently objected to direct reporting requirements . . . on the ground that such requirements infringe upon the President's constitutional supervisory authority over Executive Branch subordinates and information."); *Authority of the Special Counsel of the Merit Systems Protection Board to Litigate and Submit Legislation to Congress*, 8 Op. O.L.C. 30, 34, 36 (1984) ("[T]he Special Counsel has proposed legislation authorizing him to submit directly to Congress legislative recommendations that he 'deems necessary to further enhance the ability of the office to perform its duties.'"; "The Special Counsel's proposal would severely impair the President's ability to perform his constitutional obligation to 'recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient.'"); *see also Separation of Powers*, 20 Op. O.L.C. at 174–75; *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 254–55 (1989); *Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 639–42 (1982). But even if these bypass statutes are constitutional, none of them speaks to OMB or OIRA review of an agency's proposed rulemakings; all of them apply only to budget requests, to proposed legislation and testimony, or to some combination thereof.

Congress's decision to enact such bypass statutes is further evidence that independent regulatory agencies are not, merely by virtue of tenure protection, entirely free from presidential supervision (contra the dictum in *Humphrey's Executor*). Congress has expressly sought to limit OMB's authority to coordinate the interagency clearance process in various respects, but has not imposed any statutory restrictions on OMB's authority to conduct regulatory review. This only underscores that Congress left the latter untouched. We must presume that Congress "says what it means and means what it says" in these statutes. *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016). By their plain terms, these statutes do not purport to forbid requiring independent regulatory agencies to participate in the EO 12866 centralized review process.

Congress has also required two agencies to submit certain financial operating plans and forecasts to OMB, but then provided in a "rule of con-

struction" that those requirements "may not be construed as implying" that OMB has "any jurisdiction or oversight over the affairs or operations" of the agencies. 12 U.S.C. § 1827(c)(3) (Federal Deposit Insurance Corporation); *see also id*. § 5497(a)(4)(E) (CFPB). By its own terms, that rule of construction simply precludes the inference that the agencies' submission of required documents otherwise implies OMB supervision. The rule of construction, like OMB bypass statutes generally, does not speak to or limit the President's authority under Article II to require an agency to participate in centralized regulatory review of the agency's proposed rulemakings.

4. *Sunshine Act*. Congress has required multi-member agencies to comply with the Government in the Sunshine Act, 5 U.S.C. § 552b, but the requirements of that law do not preclude application of EO 12866. The Sunshine Act applies to any "agency . . . headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate." *Id*. § 552b(a)(1). The Act requires that "every portion of every meeting" of such an agency "be open to public observation," subject to various exceptions, *id*. § 552b(b), and it defines a "meeting" as "the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business," *id*. § 552b(a)(2). The public is entitled to at least one week's advance notice of any such meeting. *Id*. § 552b(e)(1). The Act's requirements do not apply to formal rulemakings, *see id*. § 552b(c)(10); *Time, Inc*. *v*. *U.S. Postal Serv*., 667 F.2d 329, 334 (2d Cir. 1981), but there is no comparable exception for informal rulemakings—the kind of rulemakings to which EO 12866 applies, *see* EO 12866, § 3(d)(1). Thus, the Act requires covered agencies, such as the SEC and FTC, to meet in public whenever a quorum of agency members convenes to engage in notice-and-comment rulemaking.

The Sunshine Act's requirements would not preclude compliance with EO 12866, because most discussions between a covered agency and OIRA would likely not qualify as a "meeting." As the Supreme Court explained in *FCC v. ITT World Communications, Inc*., 466 U.S. 463 (1984), Congress was cognizant in drafting the Sunshine Act that "the administrative process cannot be conducted entirely in the public eye." *Id*. at 469. The Act is therefore limited to "meetings" as defined above. *See id*. at 471

(holding that a "meeting" must involve deliberations "sufficiently focused on discrete proposals or issues as to cause or be likely to cause the individual participating members to form reasonably firm positions" (internal quotation marks omitted)). Many of the consultations that occur in the EO 12866 process likely would not meet that standard. As the Court explained, "'informal background discussions that clarify issues and expose varying views' are a necessary part of an agency's work," and the Act was not intended to "prevent such discussions." *Id*. at 469–70 (brackets omitted). A "meeting" also must involve "at least the number of individual agency members required to take action on behalf of the agency." 5 U.S.C. § 552b(a)(2). An exchange of views between OIRA and the staff of an agency (or its Chairman) during the EO 12866 process would not qualify. Thus, the Sunshine Act would be consistent with applying EO 12866 to independent agencies.

\* \* \* \* \*

We thus conclude that none of the common statutory hallmarks of independent agencies would stand in the way of applying EO 12866 to such agencies. Nothing in the centralized regulatory review process is inconsistent with their traditional "independence." EO 12866 expressly preserves the substantive rulemaking discretion afforded to independent agencies, just as it preserves the substantive discretion enjoyed by non-independent agencies. It does so, however, within the framework of presidential supervision and OIRA administrative expertise that has promoted good administrative governance since the earliest days of the Reagan Administration.

Finally, we note that our conclusion is consistent with those of the Administrative Conference of the United States and the American Bar Association, both of which have long endorsed the President's authority to extend EO 12866 to independent agencies.[15] A 2017 report by the House

---

[15] *See, e.g.*, Section of Administrative Law and Regulatory Practice, ABA, *Improving the Administrative State: A Report to the President-Elect of the United States* at 10 (2016); Letter for Ron Johnson, Chairman, and Thomas R. Carper, Ranking Member, Senate Committee on Homeland Security and Governmental Affairs, from Thomas M. Susman, Director, Governmental Affairs Office, ABA, *Re: Support for S. 1067, the "Independent Agency Regulatory Analysis Act of 2015"* (July 23, 2015); House of Delegates, ABA, *Recommendation: Presidential Review of Rulemaking* (Aug. 7–8,

Committee on Oversight and Government Reform similarly opined that the President "has always had the authority to extend OIRA review to independent agencies." *OIRA Insight, Reform, and Accountability Act*, H.R. Rep. No. 115-19, at 7 (2017). As a matter of practice, OMB advises that "[a] number of 'independent' agencies, including the SEC, CFTC, the FCC, and others have consulted with OIRA regarding best practices for regulatory reform and cost-benefit analysis," OMB Letter at 7, and as noted above, the SSA has formally complied with the regulatory review process. We do not suggest, of course, that separation of powers questions may be decided by popular vote, but the views of congressional committees, administrative law experts, and practitioners confirm our view that extending EO 12866 to independent regulatory agencies would not compromise the appropriate and lawful performance of their statutory responsibilities.

## IV.

For the foregoing reasons, we conclude that the President may require independent regulatory agencies to comply with the centralized regulatory review process prescribed by EO 12866. There is nothing in the statutory composition of independent agencies or in their other generally shared attributes that would preclude the full application of EO 12866 to them. We have not reviewed the organic statute of each independent agency and therefore do not rule out the possibility that a particular statutory provision of a particular agency—if constitutionally valid and sufficiently

1990), https://www.americanbar.org/content/dam/aba/directories/policy/1990_am_302. authcheckdam.pdf; *Recommendations of the Administrative Conference Regarding Administrative Practice and Procedure*, 54 Fed. Reg. 5207, 5208 & n.2 (Feb. 2, 1989); Strauss & Sunstein, *Role of the President*, 38 Admin. L. Rev. at 206–07 (reprinting recommendation of the Administrative Law Section of the ABA). Former officials from independent agencies have offered the same view. *See* Letter for Ronald H. Johnson, Chairman, Senate Committee on Homeland Security and Governmental Affairs, from Nancy Nord, Former Commissioner, Consumer Product Safety Commission, et al., at 1 (June 17, 2015) (letter from eight former members of independent agencies). A number of academics have done the same. *See also, e.g.*, Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 837; Robert W. Hahn & Cass R. Sunstein, *A New Executive Order for Improving Federal Regulation? Deeper and Wider Cost-Benefit Analysis*, 150 U. Pa. L. Rev. 1489, 1535 (2002); Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2324–25 & n.311; Strauss & Sunstein, *Role of the President*, 38 Admin. L. Rev. at 200.

clear—may conflict with certain requirements of EO 12866. EO 12866 expressly contemplates, however, that it would yield to such a provision, and such a potential conflict would therefore pose no barrier to the general extension of EO 12866.

Should an independent agency identify a specific statutory provision that it believes requires modification of the processes and procedures of EO 12866, we would be happy to examine the matter. Please let us know if we may be of further assistance in that or in any other regard.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*